

U.S. DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

FILED    JUL 2 5 2006

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ERIC F. JONES | CIVIL ACTION |
| VERSUS | NO. 04-2392 |
| ENTERGY LOUISIANA, INC. | SECTION "N" (4) |

## ORDER AND REASONS

Presently before the Court is the motion for summary judgment filed by Defendant Entergy Louisiana, Inc. (Rec. Doc. No. 40). For the reasons stated herein, **IT IS ORDERED** that the motion is **GRANTED**.

## Background

Plaintiff is an African-American male. He has asserted claims of race discrimination, retaliation, and hostile work environment under 42 U.S.C. §§ 2000e et seq. (Title VII) and 42 U.S.C. §1981 (Section 1981). These claims arise from Plaintiff's termination from employment with Defendant, on or about August 21, 2003, as a senior line mechanic or lineman. Plaintiff complains that Defendant's stated reason for terminating him is false and that his termination actually occurred because of race discrimination by management. Plaintiff further contends that he was terminated because he previously had objected to management's prior acts of race discrimination.

___ Fee_____
___ Process_____
_X_ Dktd_____
___ CtRmDep._____
___ Doc. No._____

## Law and Analysis

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The materiality of facts is determined by the substantive law's identification of which facts are critical and which facts are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed.2d 202 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.*

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its summary judgment burden by merely pointing out that the evidence in the record contains insufficient proof concerning an essential element of the nonmoving party's claim. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986); *see also Lavespere v. Liberty Mut. Ins. Co.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the moving party carries its burden pursuant to Rule 56(c), the nonmoving party must "go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S. Ct. 2553; *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed.2d 538 (1986); *Auguster v. Vermillion Parish School Bd.,* 249 F.3d 400, 402 (5th Cir. 2001).

When considering a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party, *Gillis v. Louisiana,* 294 F.3d 755, 758 (5th Cir.

2

2002), and draws all reasonable inferences in favor of that party. *Hunt v. Rapides Healthcare System, L.L.C.,* 277 F.3d 757, 764 (2001). Factual controversies are to be resolved in favor of the nonmoving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (citations omitted). The Court will not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts." *See id.* (emphasis in original) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed.2d 695 (1990)).

Although the Court is to consider the full record in ruling on a motion for summary judgment, Rule 56 does not obligate it to search for evidence to support a party's opposition to summary judgment. *Malacara v. Garber,* 353 F.3d 393, 405 (5th Cir. 2003) ("When evidence exists in the summary judgment record but the nonmovant fails even to refer to it in the response to the motion for summary judgment, that evidence is not properly before the district court."). Thus, the nonmoving party should "identify specific evidence in the record, and articulate" precisely how that evidence supports his claims. *Forsyth v. Barr,* 19 F.3d 1527, 1537 (5th Cir.), *cert. denied,* 513 U.S. 871, 115 S. Ct. 195 (1994).

The nonmovant's burden of demonstrating a genuine issue is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence." *Little,* 37 F.3d at 1075. Rather, a factual dispute precludes a grant of summary judgment only if the evidence if sufficient to permit a reasonable trier of fact to find for the nonmoving party. *Smith v. Amedisys,* 298 F.3d 434, 440 (5th Cir. 2002).

**I.**     **Race Discrimination and Retaliation**

    **A.**     **Legal Standards**

        Under the burden shifting regime articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), the plaintiff must first establish a prima facie case of discrimination. *Abarca v. Metro. Transit Auth.,* 404 F.3d 938, 941 (5th Cir. 2005); *Okoye v. Univ. of Tex. Houston Health Science Ctr.,* 245 F.3d 507, 512 (5th Cir. 2001). Once established, the prima facie case raises a presumption of discrimination, which the defendant must then rebut by demonstrating a legitimate, nondiscriminatory reason for its actions. *Okoye,* 245 F.3d at 512. If the defendant satisfies this burden, the presumption disappears, and the plaintiff must show that the defendant's reason is a pretext for discrimination. *Id.*

        With regard to pretext, the "mixed-motives" approach applies when a plaintiff argues that discrimination was a motivating factor, if not the sole motivating factor, for the defendant's actions. Under those circumstances, a plaintiff seeking to rebut an employer's legitimate, nondiscriminatory reason for an employment action must "offer sufficient evidence to create a genuine issue of material fact that (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." *See Rachid v. Jack in the Box, Inc.,* 376 F. 3d 305, 310-313 (5th Cir. 2004) (internal citations omitted); *see also Desert Palace, Inc. v. Costa,* 539 U.S. 90, 123 S. Ct. 2148 (2003).

If the plaintiff carries his burden of presenting a genuine issue of material fact as to pretext, or that his protected characteristic was a motivating factor for the adverse action, the defendant, to defeat the plaintiff's claim, must show that the same action would have been taken regardless of the impermissible motivating factor. *Rachid*, 376 F.3d at 312-13. The employer's final burden is effectively that of proving an affirmative defense. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005).

The framework for analyzing a retaliation claim is the same. *Rios v. Rossotti*, 252 F.3d 375, 380 (5th Cir. 2001). The focus, however, is, of course, on the plaintiff's protected activity, rather than his protected characteristic.

A plaintiff makes a prima facie case for race discrimination by proving that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered adverse employment action; and (4) he was replaced by someone outside the protected class or, in the case of disparate treatment, that others similarly situated were treated more favorably. *Abarca*, 404 F.3d at 941; *Okoye*, 245 F.3d at 512-13 (citing *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 404 (5th Cir.1999)).

To establish a prima facie case of retaliation, a plaintiff must prove that: (1) he engaged in an activity that Title VII protects; (2) the defendant carried out an action that a reasonable employee would find materially adverse; and (3) a causal connection exists between the protected activity and the materially adverse action. *Burlington Northern & Santa Fe Railway Co. v. White*, 126 S.Ct. 2405, 2414-16 (2006); *Harvill v. Westward Commn's, L.L.C.*, 433 F.3d 428, 439

(5th Cir. 2005) (citing *Chaney v. New Orleans Pub. Facility Mgmt., Inc.,* 179 F.3d 164, 167 (5th Cir.1999)).

For purposes of its motion for summary judgment, Defendant has assumed that Plaintiff can set forth a prima facie case of discrimination and/or retaliation. *See* Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem.") at 3 and 22. Thus, the Court shall do the same and focus its inquiry on Plaintiff's ability to establish that Defendant's given reasons for his termination were pretext for race discrimination and/or retaliation, or that race discrimination and/or retaliation were motivating factors for his termination. *See* Plaintiff's Revised Opposition Memorandum ("Rev. Opp.") at 22.

**B.    Analysis**

Plaintiff's August 2003 "separation notice" states that he was discharged (fired) by Defendant for: "Failure to discharge duties in a manner designed to ensure employee and public safety; specific incident of 513 Dunbar where energized open wire secondary was broken leaving multiple customers with partial power and a hazardous condition." *See* Plaintiff's Exh. ("Pltf. Exh.") 2; Defendant's Exh. ("Def. Exh.") J, ¶12. Defendant contends that this incident, when considered along with Plaintiff's prior disciplinary history, justified and was the sole basis for Plaintiff's termination. West Bank Network Manager Gary Bazile, Human Resources Manager Sammie Raney, Lead Network Manager Richard H. Torres, Vice President of Operations Randall W. Helmick, and Human Resources Manager Michael Bermingham concurred that termination was appropriate. *See* Bazile, Raney, Torres, Helmick, and Bermingham Decs., Def. Exhs. A, E, F, I, and J. Renae Conley, President and CEO of Entergy, Louisiana, Inc., also was consulted, and approved the decision to

6

terminate Plaintiff. *See* Conley Dec., Def. Exh. D. All involved in the termination decision affirmatively state in their declarations that neither Plaintiff's race nor his prior complaints had anything to do with the termination decision.

Plaintiff counters that his August 2003 termination was the culmination of a series of discriminatory and retaliatory acts by Mr. Bazile that commenced soon after Plaintiff transferred to Mr. Bazile's department in 2000. Specifically, Plaintiff contends that Mr. Bazile discriminated against him because of his race by denying Plaintiff of training opportunities and personal usage of company facilities that were provided to white employees. Thereafter, when he objected to Mr. Bazile and other managers in Defendant's organization about this treatment, as well as other unfair and discriminatory disciplinary measures imposed by Mr. Bazile, Plaintiff alleges that Mr. Bazile retaliated with further inappropriate and unwarranted discipline designed to ultimately result in Plaintiff's termination.

As explained herein, the Court finds that Plaintiff has not established that genuine issues of material fact exist with respect to whether Defendant's stated reason for his termination was false, or that race discrimination and/or retaliation were a motivating factor for his termination. Recognizing that Plaintiff disputes Defendant's conclusions regarding his conduct at a service visit to 513 Dunbar Street, the Court nevertheless concludes, based on the summary judgment evidence, that no trier of fact could reasonably determine that adequate factual support did not exist for Defendant's findings regarding that conduct. Nor are the other events referenced by Plaintiff sufficient to raise triable issues relative to his termination. Thus, given Plaintiff's disciplinary

history, the Court finds no basis for a finding that Defendant's decision to terminate Plaintiff, rather than imposing less severe discipline, was not a reasonable exercise of its business judgment.

### 1.   513 Dunbar Street

A review of the parties' materials reveals that the "specific incident of 513 Dunbar" referenced in Plaintiff's separation notice refers to a service visit that Plaintiff made at that residential address on July 4, 2003, at approximately 12:30 a.m. According to Defendant, Mr. Bazile and others subsequently conducted an investigation indicating that Plaintiff, while at 513 Dunbar Street, negligently failed to discover that an uninsulated, energized power line had broken and fallen, and was lying on the customer's shed and the ground beside the shed in the customer's back yard. Anyone coming in contact with the line could have been electrocuted. *See* Plaintiff's Dep., Def. Exh. C, at 278-79. Defendant further contends that Plaintiff failed to determine that the broken line left multiple customers with only partial power until the daylight hours of July 4, 2003, when a construction crew led by Larry Matrana arrived to provide necessary repairs, and discovered the broken, fallen power line.

Plaintiff disagrees that he did "anything wrong in his brief visit to 513 Dunbar." *See* Rev. Opp. at 23. He particularly disagrees that the power line was broken at the time that he was there. *Id.* at 23-24. Rather, he maintains that, from where he was standing on the side of the house, he saw lines that were burnt, but hanging 10 or 15 feet off the ground. *Id.* Because Plaintiff could not drive his Entergy truck into the customer's back yard, and because he could not make the necessary repairs alone, he contacted dispatch and requested that the construction crew leader, Larry Matrana, call him.

8

Although Plaintiff's radio conversations with the dispatcher, Ray J. Chiasson, were recorded and available for use with this action, Plaintiff's separate conversation with Mr. Matrana was not recorded.  Plaintiff maintains, however, that he informed Mr. Matrana that the customer had partial power and that the repairs would require the construction crew.  *See* Rev. Opp. at 23. According to Plaintiff, Mr. Matrana responded that he and the rest of the crew had been on duty for the past 16 hours and were very tired, and asked if "the situation would be OK until the morning."[1] *Id.*  Plaintiff states that he told Mr. Matrana that "he [Matrana] needed to look at it and it needs to be repaired." *Id.*  According to Plaintiff, Mr. Matrana decided that he and the crew would wait to do the repairs until the next morning because they were tired.[2] *Id.*

Plaintiff further states that he then informed Mr. Chiasson, the dispatcher, that (1) he had talked to Mr. Matrana; (2) Mr. Matrana was going to take care of the situation "first thing in the morning"; and (3) "the situation could get worse during the night . . . [in that] the wire may turn loose, fall apart and may come down." *Id.*  Plaintiff contends that, pursuant to company procedure, it was Mr. Matrana's decision, as leader of the construction crew, not Plaintiff's, whether to come to 513 Dunbar Street immediately, or instead wait until morning. *Id.*  Further, Plaintiff maintains that he "did not observe an unsafe condition, [] did not cause an unsafe condition, . . . did not purposefully leave an unsafe condition, [] and that the wire could have moved during the night. *Id.* at 24.

---

[1]      All of the line mechanics had been working long hours for several days because of damage caused by a recent tropical storm.

[2]      As with several other statements set forth herein regarding the events of July 3-4, 2003, Plaintiff's reference to "the next morning," at approximately 1:00 a.m, actually referred to some time during the daylight hours of that same day – July 4, 2003.

Plaintiff emphasizes that neither George Davis, the meter services installer who purportedly went to 513 Dunbar Street earlier in the day on July 3, 2003, Mr. Chiasson, the dispatcher, nor Chad Bourg, the customer living at the address, ever told him that a line was down. *Id.* at 9-11. He also maintains that, if in fact a line was down and the meter services installer was aware it was down, he should have remained on-site until help arrived, and should have been disciplined for failing to do so. *Id.* at 9. That no meter services installer was disciplined for this event, argues Plaintiff, suggests that no line actually was down. *Id.* Plaintiff additionally emphasizes that Mr. Bourg's declaration states that he does not recall talking to anyone from Entergy other than Plaintiff after calling in his complaint. *Id; see also* Pltf. Exh. E. Finally, Plaintiff points out that Mr. Bazile wrote a memo to the file about the incident, dated July 29, 2003, that does not mention Mr. Davis or that a meter services installer had been to the residence at Dunbar Street prior to Plaintiff's arrival. *See* Rev. Opp. at 9; Pltf. Exh. 3.

The Court's review of the remaining summary judgment evidence regarding this incident, however, reveals other pertinent facts.

### a.    Deposition Testimony of the Customer at 513 Dunbar Street

The testimony of Chad Bourg, the customer living at 513 Dunbar Street at the time of Plaintiff's July 4, 2003 service visit, is particularly significant. *See* Bourg Dep. at 9-71, Def. Exh. B.[3] His August 3, 2005 deposition transcript, and Exhibit 1 thereto, reveal that he discovered, sometime during the daylight hours of July 3, 2003, that a power line behind his house had broken

---

[3]    Unless otherwise indicated, all references regarding Mr. Bourg's testimony refer to his deposition transcript.

in the middle, but remained connected at each end to two poles located near the left and right back corners of his property.[4]   According to Mr. Bourg, the line remained down, on the shed and the nearby ground, throughout the day and night of July 3, 2003, until Mr. Matrana's construction crew arrived in the daylight morning hours of July 4, 2003, to repair it.  Indeed, Mr. Bourg said that he wanted his mother, who lived in the smaller house behind his, to sleep in his house, rather than hers, on the night of July 3, 2003, because of his concern about the downed power line.

The pole that Mr. Bourg referred to as Pole No. 1 in his deposition was located in the rear left corner (assuming the viewer faced the property with his back to Dunbar Street) of his back yard;  Pole No. 2 was near the rear right corner (assuming the viewer faced the property with his back to Dunbar street) of the back yard.  Mr. Bourg testified that the line still attached to Pole No. 1 lay on top of the shed, curled over and looped around, and that 2-3 feet of it were on the ground near the shed.   The other side of the line, which was attached to Pole No. 2,  was tangled in neighboring trees and bushes, was difficult to see, and may or may not have been touching the ground.

Mr. Bourg also testified that driveways were located on the left and right sides of his house.  The left driveway extended nearly the length of the house;  the right driveway actually was more of a carport with a chain-link fence and gate at the end.  Beyond the gate was a side door to his home and the meter box.  Mr. Bourg explained that his back yard, unlike his front yard, was not particularly well lit at night.  Accordingly, he believed that a flashlight would be needed to read the

---

[4]        At his deposition, Mr. Bourg, drew an illustration of his property at 513 Dunbar Street, as of July 4, 2003, at the request of counsel.  That document was attached to Mr. Bourg's deposition transcript as Exhibit 1. Defendant attached it as Exhibit N to its summary judgment motion.  For reference, the Court has attached that document to this Order as Court's Exhibit 1.

meter.  He similarly testified that someone standing at the meter box would be able to see the power lines in the back yard, but "couldn't see where the problem was."  He likewise said that someone standing in the *right* driveway would not be able to see that the line was down.  On the other hand, someone standing at the far end of the *left* driveway could see the top of the left pole, and a wire coming down on the top of the shed, at night *if* that person had a light.  He also indicated that Plaintiff's truck was parallel parked on Dunbar Street, on the right side of the house, and was not pointed toward his driveway or yard.

Mr. Bourg testified that, to his knowledge, Plaintiff did not go into the back yard.  Nor did he ask Mr. Bourg for a flashlight.   He indicated that Plaintiff never mentioned the possibility of cutting all of Mr. Bourg's power off so that the fallen line would not be energized.

Mr. Bourg could not verify whether other persons in this neighborhood also only had partial lights on July 3-4, 2003, but was "sure they did," as most of the time "they" all lost and regained power together.  He also suggested that the persons behind him on Deerfield Street lost power, but was not sure about that.

### b.    July 3-4, 2003 Dispatch Recordings

The Court has reviewed certain portions of the recordings of the dispatch communications from July 3-4, 2003.  *See* CD of DOC Recordings, Att. 1 to Def. Exh. P.  In Track No. 1, the dispatcher states that the customer at 513 Dunbar Street has reported a "line in the back yard down."  In Track No. 3, an Entergy representative, who the Court assumes to be George Davis, an Entergy meter services installer, reports back that a tree previously had fallen across the line, which had been repaired.  Mr. Davis states that the wire probably had popped and that the customer

12

has only partial service.   In Track No. 7, the dispatcher tells Plaintiff that 513 Dunbar Street has

"half lights" and "a wire hanging over the shed also."   In Track No. 11, Plaintiff reports to the

dispatcher, after going to 513 Dunbar Street, that some "336 [wire] . . . [was] burnt pretty good.  He

further states "it [the line] should hold the rest of the night" and is only affecting this one customer.

Plaintiff finally states, regarding the service request: "I notified Larry [Matrana].  Just hold onto that

ticket .  He [is] going to come out and change it in the morning unless it breaks loose and come[s]

apart and come[s] down but, other than that, we are going to hold that one and he's going to come

change it in the morning.  I notified the customer of the situation."

### c.        Deposition Testimony of Plaintiff

Plaintiff's deposition testimony also is particularly revealing regarding the extent of

his investigation of the situation at 513 Dunbar Street.[5]  Plaintiff testified that he did not go into Mr.

Bourg's back yard to investigate the source of the power problem because the yard was dark and he

did not have a functional flashlight.  *See* Plaintiff's Dep., Def. Exh.C, at 264-272.[6]  From the light

of the truck shining into the yard, he said that the line looked like it  "may not have severed or broken

all the way," . . . but that he "couldn't get a good visual on it."  *Id.* at 267.   He also said that it

appeared that something was holding the line.  *Id.* Significantly, Plaintiff testified that he did not see

a line lying on the shed.  *Id.* at 276.  Indeed, he said he did not see a shed, and admitted that he could

not see the whole line.  *Id.*    Nevertheless, despite his limited ability to see the line problem,

---

[5]        The cover page and pages 264-276 of that transcript are attached to this Order, for
reference, as Court's Exhibit  2.

[6]        The one in his service truck had a blown bulb.  *See* Plaintiff's Dep., Def. Exh.C at
271.

Plaintiff testified that he told Larry Matrana: "[i]t's possible everything might be okay here." *Id.* at 269. Plaintiff did not tell Mr. Matrana that he had not gone into the back yard or that he did not have a flashlight. *Id.* at 271.

**d.     Deposition Testimony of the Construction Crew Leader**

Mr. Matrana, the leader of the construction crew, testified in his deposition that, when he and Plaintiff talked on July 4, 2003, Plaintiff reported that 513 Dunbar Street had a wire that was "burnt" but "in the clear," and that the customer there had half lights. *See* Matrana Dep., Plft. Exh. C, at 42-47. Based on what Plaintiff told him, Mr. Matrana understood the wire to be in the air, that it could wait until the "next" day for repair, and that there was no ground hazard. *Id.* at 42-47, 80-82. Mr. Matrana denied that Plaintiff ever said that the line might break, come apart, and fall down during the night. *Id.* at 50-54. Mr. Matrana also stated that he later discovered that the customers behind Mr. Bourg, on Deerfield Street, also were without full power. *Id.* at 68-69.

Mr. Matrana agreed that it was his decision, as the construction crew leader, to decide when the construction crew must go out immediately for a repair. He emphasized, however, that those decisions are based on the information provided to him by the service line mechanic who actually is on-site and has observed the situation. *Id.* at 49-51. According to Mr. Matrana, a service line mechanic who discovers a downed line, but cannot repair it alone and requires the construction crew, should remain with the line until the crew arrives, or make the area safe before departing by de-energizing it. *Id.* at 80.

14

e.     **Mr. Bazile's July 29, 2003 Memo Regarding His Investigation**

Mr. Bazile's July 29, 2003 memorandum to his file indicates that he commenced an investigation of several July 3-4, 2003 matters involving Plaintiff, including the 513 Dunbar Street service request, after he received a complaint from another customer about a different service visit by Plaintiff during that timeframe. *See* Pltf. Exh. 3; Bazile Supp. Dec., Def. Exh. S.   According to that customer, her July 4, 2003 service request was not completed until July 9, 2003, when another service person, not Plaintiff, made the necessary repairs. *See* Pltf. Exh. 3; Bazile Supp. Dec., Def. Exh. S. In addition, Mr. Bazile's memo states that he also was concerned by Plaintiff's 21.5 hours of double time worked on July 4th without a call for help to the "stand by" man, who "did not receive a single call." *See* Pltf. Exh. 3.  The memo sets forth various information that Mr. Bazile obtained as part of his investigation, which included interviewing Gidget Schneider, the customer making the complaint that incited the investigation, Plaintiff, Mr. Matrana, Mr. Bourg, and Mr. Chauff, the customer living behind Mr. Bourg at 528 Deerfield Street. *Id.* It also states that, on July 15, 2003, Mr. Bazile informed Plaintiff that, because of the information he had discovered from his investigation, and because Mr. Bazile was worried about Plaintiff's and the public's safety, Plaintiff would be working only construction duty until further notice.[7] *Id.*

Significantly, the memo, which was prepared in the weeks following the events at 513 Dunbar Street, reflects that information was provided to Mr. Bazile by Mr. Matrana that is consistent with Mr. Matrana's deposition testimony, except that the memo states Mr. Matrana was told "no customers were out." *Id.*   The memo also indicates that Mr. Bourg, the customer at 513 Dunbar

---

[7]     Since May 15, 2003, as a result of other disciplinary action, Plaintiff had been working construction crew duty during the day and service duty during the night and on weekends.

Street, provided information to Mr. Bazile that is consistent with Mr. Bourg's deposition testimony. *Id.* Finally, Mr. Chauff's description of the broken power lines running between his and Mr. Bourg's back yards, as reflected in Mr. Bazile's memo, is consistent with that provided by Mr. Bourg, insofar as Mr. Chauff indicated that wire was hanging in vegetation along the fence, and that wire was laying on the roof of the neighbor's shed and on the ground. *Id.* Mr. Bazile's memo also states that Mr. Chauff "pointed to the other pole" and indicated that there was also a short piece of wire hanging down from it. Finally, Mr. Chauff stated that he also was experiencing partial power at that time. *Id.*

### f.    Entergy's Policy Regarding Meter Services Installers

George Davis, the meter services installer sent to 513 Dunbar Street, prior to Plaintiff going there on July 4, 2003, reported to the dispatcher that a service line mechanic was required at that location. Mr. Davis did not remain at that location until Plaintiff arrived, however, and did not otherwise secure the situation.

Evidence submitted by Defendant indicates that, in connection with trouble calls, meter services installers often are sent to determine whether the line in question is an electric, phone, or cable line. *See* Brignac and Trahan Decs., Def. Exhs. R and T. If electric, the meter services installer then informs the dispatcher that a line mechanic is required. *Id.* They are not trained to touch power lines, not provided with equipment necessary to work on power lines, and have no authority to attempt to resolve trouble. *Id.*

Mr. Bazile was not Mr. Davis' supervisor and had no authority to discipline him in connection with the 513 Dunbar incident. *See* Bazile Supp. Dec., Def. Exh. S. Kathleen Brignac,

16

who was Mr. Davis's supervisor, did not discipline Mr. Davis because his departure from that

location, prior to the arrival of a line mechanic, did not violate Entergy policies in effect at that time

for meter services installers. *See* Brignac Dec., Def. Exh. R. Subsequent to that incident, and at Mr.

Bazile's expression of concern regarding the matter, the policy was changed to require that, under

such circumstances, meter services installers remain until a line mechanic arrives. *See* Bazile Supp.

Dec., Def. Exh. S; Brignac Dec., Def. Exh. R.[8]

       There is no dispute, however, that a line mechanic, like Plaintiff, is charged with

accurately assessing the cause of the problem and securing it, and should not leave a situation that

is not secure and could result in a member of the public, or other Entergy personnel, being

electrocuted. *See* Bazile Dec., Def. Exh. A; Plaintiff's Dep., Def. Exh.C, at 273-75.[9] If a line

------

[8]     The Court acknowledges that it seems that the reference to "any employee" in the safety rules set forth, *infra*, in Note 9, would seem to include Entergy meter services installers. Plaintiff, however, has presented no evidence controverting Ms. Brignac's assertion that, as of July 3-4, 2003, the company policies applicable to meter services installers did not require that they remain at a location with a downed power line until the arrival of a line mechanic. Plaintiff cites to the deposition testimony of Jude Orgeron to support the contention that meter servicemen observing an unsafe condition should remain at the site until the line mechanic arrives. *See* Rev. Opp. at 9; Orgeron Dep, Pltf. Exh. O, at 24. Mr. Orgeron actually testified only that "usually" meter serviceman will stand by and wait for the serviceman [service line mechanic] to arrive. *See* Orgeron Dep, Pltf. Exh. O, at 24. In any event, Plaintiff has made no showing of Mr. Orgeron's qualifications and authority to establish what required conduct was for meter service installers as of July 3-4, 2003.

[9]     In addition, Paragraph 5.5 of the Entergy System Policies and Procedures, effective March 3, 2000, required, in pertinent part: "Employees are responsible for knowing and complying with all Safety Health Compliance Policies applicable to their work and for being alert and abating potential hazards as they arise; . . . . for maintaining an awareness of equipment and surroundings and taking proactive measurements to avoid accidents; for analyzing his or her surroundings and anticipating potential hazards of the job before the work begins. . . ." *See* Exh. 5 to Def. Exh. A. Paragraph 6.1 of those Policies and Procedures further directed: "Each employee observing an unsafe conditions or act shall either correct the act or condition if he or she can do so safely, or secure the condition and report the unsafe condition immediately to supervision for action." *See* Exh. 5 to Def. Exh. A. Indeed, Plaintiff's statement to the dispatcher that they were going to wait on the repair until tomorrow, unless the line "comes down," clearly acknowledges the immediate need to secure an energized line lying on the ground.

mechanic cannot secure the problem alone, he must call for assistance and remain there until it arrives.   Bazile Dec., Def. Exh. A.  Plaintiff, however, asserts that he did not violate this rule because he was not aware that an energized, uninsulated power line was on the ground, or in reach of someone on the ground, at the time he was at 513 Dunbar Street.

### g.      The Court's Determination Regarding 513 Dunbar Street

Considering the foregoing evidence, the Court does not find that a genuine issue of material fact exists with respect to the adequacy of the factual support for Defendant's decision to terminate Plaintiff for his actions in connection with 513 Dunbar Street.   Even if factual disputes, as urged by Plaintiff, exist with respect to Mr. Davis's earlier visit to that address and/or discussions with the customer, as well as to certain information provided to Plaintiff by the dispatcher and/or the customer, they are not sufficient to create a triable issue with respect to the validity and reasonableness of conclusions by Mr. Bazile and other members of management that Plaintiff committed safety and service violations.   Indeed, Plaintiff's own deposition testimony reveals his lack of investigation and full awareness of the condition of the power lines located at the rear of the property at 513 Dunbar Street.

Significantly, Plaintiff has offered no explanation why, despite the limitations on his ability to see into the customer's back yard at night, he did not have the "stand by" man bring him a flashlight, or even leave the premises (after warning the customer to stay indoors) just long enough to retrieve a flashlight.   Nor does he explain why he did not simply ask Mr. Bourg about his understanding of the problem, given the poor visibility of the whole line, and that, despite the dispatcher's reference to a shed, Plaintiff never even saw a shed.

Thus, considering the summary judgment evidence, the Court concludes that no genuine issue of material fact has been demonstrated with respect to whether: (1) an energized and uninsulated power line was lying on the customer's shed and the surrounding ground at the time Plaintiff was at the location; (2) Plaintiff was unaware of this situation and did not reasonably investigate it; (3) Plaintiff therefore did not accurately report the situation to Mr. Matrana; (4) Plaintiff left 513 Dunbar Street without securing it for the public by having the necessary repairs completed or de-energizing the power lines; and (5) at least two homes in that area remained without power.

### 2.   Other Incidents Involving Plaintiff

In addition to attacking the validity of Defendant's assessment of his conduct at 513 Dunbar Street, Plaintiff asserts that other actions by Defendant demonstrate that his termination resulted from Mr. Bazile's race discrimination and/or retaliation for Plaintiff's prior complaints about that discrimination. Specifically, Plaintiff complains about the validity of Mr. Bazile's disciplinary and other decisions regarding Plaintiff. He also points to alleged favorable treatment of white employees in terms of employment benefits offered to them and a lack of discipline imposed against them for allegedly comparable conduct.

To establish actionable disparate treatment, Plaintiff must demonstrate that non-African-Americans received preferential treatment under "nearly identical" circumstances." *Okoye v. Univ. of Tex. Houston Health Science Ctr.*, 245 F.3d 507, 514-15 (5th Cir. 2001); *Perez v. Tex. Dept. of Crim. Justice,* 395 F.3d 206, 213 (5th Cir. 2004); *Wyvill v. United Cos. Life Ins. Co.*, 212 F.3d 296, 304 (5th Cir. 2000). Further, an employer's actions are not unlawful simply because they

are "unfair." Rather, Title VII protects only against decisions motivated by discriminatory or retaliatory intent. *Nieto v. L&H Packing Co.*, 108 F.3d 621, 624 (5th Cir. 1997) (citations omitted). Similarly, the Court is mindful that, although close timing between an employee's protected activity and an employer's materially adverse action is one relevant factor, it alone is not sufficient to establish a plaintiff's burden on his retaliation claim. *McCarthy v. Primedia Workplace Learning Ctr.*, 2005 WL 3428191, *3 (N.D. Tex.) (Lynn, J) (citing *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993)); *Juarez-Keith v. U.S. Foodservice, Inc.*, 2005 WL 548074, *8 (N.D. Tex.) (Lindsay, J.); *Martinez v. Prestige Ford Garland Ltd. P'ship.*, 2004 WL 1194460, *6 (N.D. Tex.) (Lindsay, J.). Nor does merely disputing an employer's assessment of a plaintiff's work performance or disciplinary history. *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001). The relevant inquiry instead is whether the evidence, taken as a whole, supports an inference of retaliation. *Id.* at 355. Having reviewed Plaintiff's evidence and arguments regarding these incidents in light of the relevant legal principles, the Court concludes that they, even when viewed together, likewise fail to create a genuine issue of material fact regarding Defendant's motives for terminating him from employment.

### a.   Flame Resistant Shirt Discipline:  July 2000

Plaintiff complains about Mr. Bazile's issuance of a written warning to him in July 2000 for wearing a sleeveless cotton shirt, rather than his company-issued flame resistant shirt, while performing a switching job. Plaintiff complains that the warning was unjustified, and that Mr. Bazile had previously seen him wearing this shirt without disciplining him, or saying anything about the shirt. He also maintains that he had seen Mr. Bazile observing white lineman working without shirts without saying anything to them.

20

Plaintiff has presented no evidence that Mr. Bazile's reasons for the warning were false or racially discriminatory. Entergy's policies did not permit wearing sleeveless shirts. *See* Entergy Safety Manual, §§ 4.60 and 9.4, Exh. 1 to Def. Exh. A. Further, Plaintiff acknowledged that Mr. Bazile previously had not disciplined him about his attire. The instant situation differed from that prior experience, as well as Mr. Bazile's treatment of other personnel regarding their shirts (or lack thereof), because Plaintiff's photograph in this attire appeared in the *Times Picayune* newspaper and, significantly, Mr. Bazile's superior, Director Distribution Operations Greg Grillo, upon seeing the photograph, instructed Mr. Bazile to take some action to ensure the situation would not occur in the future. *See* Grillo Dec., Def. Exh. G; Bazile Dec., Def. Exh. A. Having invested in the flame resistant shirts bearing the company logo, Defendant wanted the line mechanics to wear them for safety reasons and to project a professional image. *See* Grillo Dec., Def. Exh. G; Bazile Dec., Def. Exh. A. The memorandum to the file prepared by Mr. Bazile on July 17, 2000, consistently reflects these concerns, and has a copy of the newspaper photograph attached. *See* Exh. 2 to Def. Exh. A. The Court further notes that, in addition to the warning, Mr. Bazile's memo reflects commendation for Plaintiff's quick response to the power problem. *Id.*

### b.    <u>Training: 2001-2003</u>

Plaintiff has alleged that on a number of occasions he asked Mr. Bazile to allow him to receive the computer training necessary to enable him to perform the department scheduling on the computer. Plaintiff sought this training because he wanted to learn skills necessary to advance within the department. According to Plaintiff, Mr. Bazile repeatedly responded that Plaintiff would have to obtain this training "on his own time." *See* Rev. Opp. at 2-3, and 14. Plaintiff objects to this response as racially discriminatory in that he contends that white line mechanics, specifically Keith

Guthrie, Larry Matrana, and Roger Welch, unlike him, were allowed by Mr. Bazile to use the computers to learn scheduling while on company time. *Id.* Plaintiff also states that he asked Mr. Bazile why he was discriminating against Plaintiff by not allowing him to learn scheduling on the same terms as these white lineman. *Id.*

   For several reasons, the Court does not find that Plaintiff has established a genuine issue of material fact with respect to whether Mr. Bazile discriminated against him on the basis of his race regarding computer scheduling training while on "company time."  First, Mr. Bazile, Raymond Balser, and Operations Coordinators Mr. Janusa and Danny C. Rivolo have consistently testified that, from the time Plaintiff began working under Mr. Bazile, in 2000, until March 2002, Mr. Balser, not any other line mechanics, was responsible for line mechanic scheduling on the Distribution Service System (DSS) program.[10]

   During the time Mr. Balser handled scheduling, Mr. Bazile neither instructed him to train any line mechanic in scheduling, nor refused to allow Mr. Balser to train Plaintiff or anyone else. *See* Balser Dec., Def. Exh. W;  Bazile Supp. Dec., Def. Exh. S.  Mr. Balser adds that, during the time he was responsible for scheduling, he actually did train three line mechanics – Gary Colar, who is African-American, and Eric Paolini and Roger Welch, who are white – at their requests, to do the scheduling. *See* Balser Dec., Def. Exh. W.  According to Mr. Balser, Plaintiff never asked

---

[10]  Given this arrangement, it is not surprising that Mr. Welch testified that, during the time Mr. Balser was doing the scheduling, he heard Mr. Bazile tell Plaintiff, when Plaintiff asked to learn the scheduling system,  that "he already had someone doing that and that Plaintiff did not *need* to learn it. . . . *See* Dep. of Roger Welch, Pltf. Exh J., at 27- 28 (emphasis added).  As of that time, the training would not be necessary for any of Plaintiff's current job duties. *See*  Bazile Dep., Pltf. Exh. D at 105.

him for training. *Id.*   Finally, Mr. Balser explains that he "tried to conduct most of the training off the clock or during down time, because [he] knew Mr. Bazile did not want to pay the overtime." *Id.*

Second, when Mr. Balser transferred to another department in March 2002, DSS scheduling became the responsibility of the OC's – Mr. Janusa and Mr. Rivolo. *See* Bazile Supp. Dec., Janusa Dec., and Rivolo Dec., Def. Exhs. S, V, and Z.; Bazile Dep., Pltf. Exh. D at 105. Sometime thereafter, which Mr. Janusa identifies as the late summer or fall of 2002, Mr. Bazile agreed to allow the OC's to train line mechanics to do scheduling. *See* Janusa Dec., Def. Exh. V. This was done to ensure that a line mechanic could complete the scheduling work during the absence or unavailability of the OC. *Id.;* Bazile Dep., Pltf. Exh. D at 105. Thereafter, without other involvement from Mr. Bazile, the OC's began training the line mechanics. *See* Bazile Supp. Dec., Def. Exh. S. Mr. Janusa states that Mr. Bazile never instructed him to deny Plaintiff training, or to train any under different terms than anyone else. *See* Janusa Dec., Def. Exh. V. Mr. Janusa further states that he later personally trained Plaintiff. *Id.*

Third, statements by Mr. Welch, Mr. Matrana, and Mr. Guthrie support this explanation of how scheduling, and training to do scheduling, were handled during the time that Plaintiff worked under Mr. Bazile. Mr. Welch testified that Mr. Balser taught him how to do scheduling. *See* Welch Dep., Pltf.. Exh. J, at 28. Mr. Matrana stated that he did not receive DSS training while Mr. Balser did the scheduling. *See* Matrana, Supp. Dec., Def. Exh. X. After Mr. Balser left, however, Mr. Matrana asked Mr. Rivolo about training, which training ultimately was provided to Mr. Matrana by Mr. Burkes. *Id.*; Matrana Dep. Pltf. Exh. C. at 86. According to Mr. Matrana, though some of his training was during working hours, it was primarily done during time that he was off the clock. *See* Matrana, Supp. Dec., Def. Exh. X. Mr. Guthrie states that he did not

23

receive any scheduling training until about six months after Mr. Balser transferred out of the department. *See* Guthrie, Dec., Def. Exh. Y.

The specific months and years during which Plaintiff assumedly was denied computer scheduling training are not entirely clear. His revised opposition memorandum refers to January or February 2002, and some unspecified time prior to that, which the Court presumes to have been sometime in 2001. *See* Rev. Opp. at 2-3, and 14. During his deposition, however, Plaintiff stated that he first asked Mr. Bazile for training sometime between November 2002 and January or February 2003. *See* Plaintiff's Dep, Def. Exh. C, at 50-51. Although Plaintiff ultimately did receive computer scheduling training from Mr. Janusa, he complains generally about the quality and extent of that training. *See* Plaintiff's Dep., Def. Exh. C, at 52-53.

Given the testimony outlined above regarding the manner in which scheduling and training for scheduling were handled, Mr. Bazile's alleged denial of "on the clock" computer scheduling training any time before March 2002 is neither surprising nor indicative of an impermissible motive, as Mr. Balser had assumed all responsibility for scheduling, and related training, if any, during that time period. Also consistent with the outlined testimony regarding the period after Mr. Balser's departure in March 2002, Plaintiff's 2002 Interim and Final Reviews reflect that, in October 2002, Mr. Bazile indicated that Plaintiff needed to work with the OC's to learn how to do scheduling. The February 5, 2003 Final Review indicates that the training was not set up until late in the year, and thus would be a continued focus for 2003. *See* Exh. 3 to Def. Exh. S. Given this information, and that Mr. Janusa ultimately did provide scheduling training to Plaintiff, the Court finds any factual dispute suggested by Plaintiff regarding any discriminatory or retaliatory denial of this training to be unfounded, or in any event, insufficient to establish a triable issue.

Plaintiff also contends that he was denied, based on his race, an opportunity to attend three days of "business" classes. He rests this assertion on the fact that, at around the same time, two white co-employees went to Mississippi for training. *See* Rev. Opp. at 2. Mr. Bazile has testified without contradiction that he has never approved attendance of business classes for line mechanics. *See* Bazile. Supp. Dec., Def. Exh. S.[11] Mr. Guthrie testified that he and Ron Bushnell, Sr. went to Mississippi for training on new bucket truck equipment. *See* Guthrie Dep., Pltf. Exh. at 14-16. The Court does not find, under the circumstances here, that "business" classes and bucket truck training are sufficiently similar to warrant comparison.

### c.    Rubber Gloves/Animal Guard Discipline:  June 4, 2002

On June 4, 2002, Plaintiff was disciplined by Mr. Bazile on the grounds that Mr. Bazile and Mr. Janusa observed Plaintiff failing to wear appropriate rubber gloves while installing an animal guard around a primary line that had not been grounded. Plaintiff received a two-day suspension. Plaintiff disputes whether the fuse was fully blown, and the alleged timing of Mr. Bazile's and Mr. Janusa's awareness of the violation.

---

[11]    Plaintiff also complained in his deposition that he requested, but did not receive, additional substation and switch gearing training while working under Mr. Bazile. *See* Plaintiff's Dep., Def. Exh. C, at 64-71. He further contended, with some uncertainty that white employees – Mr. Matrana and Mr. Guthrie – received this training. Mr. Matrana testified, however, that everyone in the department took a class on these subjects sometime in 2003. *See* Matrana Dep., Pltf. Exh. C, at 86-87. He was uncertain whether it was after Plaintiff's termination. *Id.* Mr. Guthrie similarly testified that he understood that "everyone" received this training. *See* Guthrie Dep., Pltf. Exh. N at 23. Prior to 2003, according to Mr. Matrana, any substation and switch gear training came from the field and from training at the Knowledge and Skills Training Center, where "everyone" goes annually. *See* Matrana Dep., Pltf. Exh. C, at 87-88. Thus, to the extent that Plaintiff did not receive certain additional training in this area, there has been no showing that he was treated differently from anyone else during the relevant time period.

Given that the line undisputedly was not properly grounded, a violation of the Entergy Safety Manual occurred. *See* Bazile Dec., Def. Exh. A, and Exh. 1 to Def. Exh A, §§9.14, 9.00a, and 1.37. Indeed, in a letter later written by Plaintiff to Daniel Packer, President and CEO of Entergy New Orleans, Inc., he admits that he violated the Entergy safety rule. *See* Att. 1 to Plaintiff's Dec., Pltf. Exh. A. Further, company policy dictated a minimum of two days off for a first offense of failing to wear proper rubber protective equipment. *See* Exh. A at §6.2.2 to Bazile Dec., Def. Exh. A. Before imposing this discipline, moreover, Mr. Bazile consulted with his supervisor, Richard Torres, Human Resources Manager Sam Raney, and Safety Specialist Tommy Cleveland, all of whom concurred in the two-day suspension. *See* Bazile, Torres, and Raney Decs., Def. Exhs. A, F and I. A memorandum to Plaintiff, prepared by Mr. Bazile and signed by him, Plaintiff, and Mr. Janusa, on August 27, 2002, consistently reflects management's statement of the factual basis for the discipline, reflects Plaintiff's discipline and those involved in determining that discipline, and further warns of increased discipline, including termination, for any similar infractions. *See* Exh. 3 to Bazile Dec., Def. Exh. A.

Following his suspension, Plaintiff complained about this discipline to Renae Conley, President and CEO of Entergy, Louisiana. *See* Rev. Opp. at 4-5. After talking with Plaintiff, Ms. Conley requested that Human Resources Manager Sam Raney investigate the matter. *See* Conley Dec., Def. Exh. D. Mr. Raney did so, and as reflected in a memorandum prepared by him to Ms. Conley, determined the discipline to be appropriate. *See* Pltf. Exh. 39. Mr. Raney's memorandum reflects that Plaintiff told Mr. Raney that he was still concerned that "management is looking for a way to get rid of him." *Id.* Neither Mr. Raney's memorandum nor Plaintiff's opposition memorandum, however, reveal that Plaintiff told Ms. Conley or Mr. Raney that he believed he had

26

been unfairly disciplined because of his race, or gave any examples of situations where white personnel had not been similarly disciplined.   Although Plaintiff contends that he complained of race discrimination to Ms. Conley and Mr. Raney, neither of them recalls any such complaints. *See* Conley and Raney Decs., Def. Exhs. D and I.  Nor are they reflected in Mr. Raney's memorandum. *See* Pltf. Exh. 39.  Plaintiff's opposition memorandum, moreover,  specifically references only Mr. Bazile's allegedly racially discriminatory handling of Plaintiff's requests for computer training and use of the company auditorium for personal reasons in connection with these discussions. *See* Rev. Opp. at 4-5.

Based on the summary judgment evidence submitted in connection with this incident, the Court determines, notwithstanding Plaintiff's complaints to Ms. Conley and/or Mr. Raney regarding the propriety of this discipline, that Plaintiff has not established a triable issue with respect to the validity of management's imposition of a two-day suspension in this instance.  Nor has any evidence been cited to demonstrate that this discipline actually resulted from discriminatory or retaliatory motives. *See* Rev. Opp. at 3-4.

### d.   Denial of Personal Use of Auditorium - June 2002

In June 2002, Plaintiff complained to Ms. Conley that Mr. Bazile had denied him personal use of the company auditorium. *See* Rev. Opp. at 4.  Plaintiff further contends that he told Ms. Conley at that time that white employees had been allowed to use the auditorium. *Id.*  Ms. Conley, however, recalls no complaints by Plaintiff of race discrimination in connection with use of the auditorium. *See* Conley Dec., Def. Exh. D.  Ms. Conley states that she informed Plaintiff that she recently had instructed managers that employees no longer would be able to use the auditorium

for personal functions. *Id.* Plaintiff disagrees that she told him this, and points to the fact that, after the meeting, Richard Torres gave him permission to use the auditorium to support his position. *See* Rev. Opp. at 4.

Notwithstanding disputes about what was said during Plaintiff's meeting with Ms. Conley regarding use of the auditorium, Mr. Bazile, who denied Plaintiff's request for use of the facility, states that he was aware of the policy change directed by Ms. Conley regarding the auditorium and thereafter did not authorize personal use of it for any employee. *See* Bazile Dec., Def. Exh. A. Plaintiff has not pointed to any evidence to the contrary, or any further evidence regarding Mr. Torres' awareness of or understanding of Ms. Conley's new policy regarding the auditorium use. In any event, Plaintiff ultimately was allowed to use the auditorium. Under these circumstances, the Court finds no triable issue of fact exists with respect to Mr. Bazile's motivation for denying Plaintiff personal use of the auditorium.

### e.   McDonald's Incident - April 17, 2003

In May 2003, Plaintiff was suspended for forty hours without pay. He was also re-assigned from service duty to construction duty (where he would work with a crew rather than alone) during the day, but was allowed to continue service duty at night and on weekends. This discipline resulted from an encounter that Plaintiff had with three pedestrians, but particularly Mr. Michael Hale, in a McDonald's parking lot on April 17, 2003. The decision to impose this discipline was made by Mr. Bazile, Mr. Torres, and Vice President of Operations Randall W. Helmick, and was based on a determination by Human Resources Manager Michael P. Bermingham that Plaintiff's

behavior violated the Company's Workplace Violence Policy.  *See* Bazile, Torres, Helmick, and Bermingham Decs., Def. Exhs. A, E, F, and J.[12]

Plaintiff contends that he first encountered Mr. Hale and two other pedestrians while he was driving through the McDonald's parking lot, and that Mr. Hale called him racially derogatory names several times while Plaintiff still was in his truck.  *See* Rev. Opp. at 6-7. Thereafter, Plaintiff contends that he, believing the three men had already entered the restaurant, parked the truck so that he could go into the McDonald's to purchase breakfast, but then encountered the racist pedestrian (Mr. Hale) on foot, who again made racially derogatory remarks, and said that he would "have [Plaintiff] fired." *Id.*  Plaintiff asserts that he asked the pedestrian "who he was and who he knows to make [Plaintiff] lose his job." *Id.*  After the man responded with more racist remarks, Plaintiff states that he told the pedestrian that "he's not worth it," who responded: "I'm going to call your boss." *Id.*  At that time, according to Plaintiff, he responded with Mr. Bazile's name and position, returned to the truck, and left without breakfast. *Id.*

Certain portions of Plaintiff's and Mr. Bazile's accounts of the incident, based on Mr. Bazile's discussions with Mr. Hale and Plaintiff the day of the incident, as well as Plaintiff's demeanor while discussing the matter at that time with Mr. Bazile and Mr. Janusa, differ.  *See* Rev. Opp. at 6-7; Bazile Dec., Def. Exh A and Exh. 4 to Def. Exh. A; and Pltf. Exh. 9.  Mr. Bazile attests that Mr. Hale denied that any racial slurs were made, and said that Plaintiff "had attempted to run over someone in a McDonald's parking lot" at 8:00 a.m., began yelling and got very irrational, and

---

[12]     That policy provides, in pertinent part:  "Threats, threatening behavior, or acts of violence executed on or off Company premises while conducting official Company business, or related in any way to one's employment or work with the Company is a violation of this policy." *See* Exh. A to Def. Exh. J.

got out of his truck and threatened Mr. Hale. *See* Bazile Dec., Def. Exh A. Mr. Bazile further states:

"As Plaintiff described the incident [at approximately 1:00 p.m.], he was still so mad that he was

spitting." *Id.* Mr. Bazile additionally maintains that, while Plaintiff was discussing the encounter

with him, Plaintiff's hand was balled into fist, and that Plaintiff said Mr. Hale told him several times:

"if you hit me, I will have your job." *Id.* A memorandum prepared by Mr. Bazile, on or about May

15, 2003, further states that Plaintiff told him that he "did exit [his] truck to 'challenge/confront the

customer." *See* Exh. 4 to Bazile Dec., Def. Exh. A.

Because the motion before the Court is one for summary judgment, it is assumed

that racially derogatory comments actually were made to Plaintiff both before and after he exited the

truck, and that he was strongly offended by them. There is no dispute, however, that Plaintiff was

in an Entergy truck, was wearing a shirt with an Entergy logo on it, and was on "company time"

while he was at the McDonald's parking lot. It is further undisputed that Plaintiff stopped and parked

the truck immediately after a verbal confrontation involving racist comments that he found very

offensive and upsetting had occurred, and that a heated conversation, involving additional racist

comments and threats to Plaintiff's job, during which Plaintiff was very upset and physically close

to the men, continued in the parking lot. Indeed, Plaintiff's May 20, 2003 letter to Mr. Packer states

that "he [Plaintiff] was very close to him [the person making racist comments]." *See* Att. 1 to Jones

Dec., Pltf. Exh. A. Plaintiff further testified at his deposition: "I don't know if he thought I was

going to be physical or do something or not." *See* Pltf. Dep, Def. Exh. C. at 237.

Given these undisputed facts, though the Court certainly does not suggest that

Plaintiff should not have taken offense to, or become upset about, any racist remarks said to or yelled

at him, it nonetheless concludes that the trier of fact could not reasonably determine that

management did not justifiably believe, based on the information before it at the time, that a member of the public had felt threatened by Plaintiff's behavior (even if that person had instigated that behavior), that Plaintiff's behavior violated the Workplace Violence Policy, and that the imposed discipline was warranted.  The Court further does not find it unreasonable for a company like Defendant, whose employees spend much of their working hours "out in the field" under stressful and dangerous conditions, without constant supervision, and with frequent interaction with members of the public – who at times may or may not have the most favorable opinion of Defendant's success in providing energy services to the community – to be extremely concerned about, and react strongly, to any allegations to arguably threatening conduct of its employees.  This is particularly true when those employees are on company time, and are wearing clothing and driving company trucks that bear the company logo.

For essentially the same reasons, a reasonable juror could not find that the discipline imposed creates an inference of racial discrimination or retaliation with respect to Plaintiff's termination.[13]  That this event followed the "rubber gloves" incident for which Plaintiff was suspended in June 2002, as well as Plaintiff's discussions of that discipline with Ms. Conley and Mr. Raney, likewise does not support an inference of a racially discriminatory or retaliatory motive. Time proximity, though relevant, is alone not sufficient.  Further, even considering the timing of these events, the favorable reviews that Mr. Bazile gave to Plaintiff following those events, in October 2002, and February 2003, further undercut any attacks on Mr. Bazile's motivation.

---

[13]     The Court additionally notes that Mr. Bazile states, without contradiction, that this was not the first complaint that he had received about erratic driving by Plaintiff.  *See* Bazile Dec., Def. Exh. A.

Specifically, in mid-October 2002, Mr. Bazile completed his 2002 "Interim Review" of Plaintiff. *See* Plaintiff's Exh. 12; Exh. 3 to Bazile Supp. Dec., Def. Exh. S. Among other things, the review states at page 5:

> Eric has done a good job the first part of this year. The only area that he fell short in was in safety, i.e. one incident of not wearing primary gloves in the primary zone. In all other areas, Eric does a real good job . . . he get along well with his peers, has a good attitude, is flexible with work assignments, dependable and overall a very solid performer. I emphasized with Eric that we will provide whatever tools, training, etc., he needs to safely perform his job. He indicated that one area that would be beneficial would be switchgear. Eric understands that he is on a very good track at this point to achieve a valuable contributor rating.

Mr. Bazile completed the "Final Review" for 2002 on February 5, 2003. *Id.* Mr. Bazile's comments include:

> Eric has done an excellent job during this past year. There was a single incident in safety that was a real setback for Eric. However, he did an excellent job rebounding from this and getting back on track. Eric possesses good line skills, has good interpersonal skills, and gets along well with his peers. Feedback from the OC's indicates that Eric is doing a better job of completing jobs, i.e. one day outs v. just zero commits. There are a couple areas to focus: 1. Don't take things personally. 2. Perception of picking overtime. Eric is a solid, consistent performer and a tremendous asset to the West Bank Organization. Eric, along with his peers, will be challenged during 2003 to bring the West Bank Organization to a new level of teamwork.

Mr. Bazile assigned Plaintiff a "Valuable Contributor" rating for 2002, which is the second best of four possible ratings. *Id.*

g.   **Events Between May 15, 2003 and Plaintiff's August 21, 2003 Termination**

After Plaintiff was suspended on May 15, 2003, he called into the Defendant's ethics hotline.  The case report of his call categorizes his complaint as "Discrimination" and "Performance Management Issues."  *See* Pltf. Exh. 40.  The report sets forth Plaintiff's statement of what occurred at McDonald's and reflects Mr. Bazile's suspension and re-assignment of Plaintiff to the construction crew.  *Id.*  It further states:

> Mr. Jones believes the true reason he was suspended is because Mr. Bazile has personal issues against Mr. Jones.  Around 11 months ago, Mr. Jones was involved in a safety issue and was reprimanded by Mr. Bazile.  Mr. Bazile spoke with Ms. Conley about this issue and informed her Mr. Bazile would attempt to terminate him in the future. Mr. Jones declined to provide further information regarding this issue.[14]

Thereafter, on May 20, 2003, Plaintiff delivered a letter to the office of Dan Packer, the President and CEO of Entergy New Orleans, Inc.  *See* Att. 1 to Pltf. Exh. A.  Among other things, the letter contends that Mr. Bazile is treating Plaintiff unfairly and that he believes Mr. Bazile is trying to establish grounds for having him fired.  *Id.*  It further references the discipline imposed for the McDonald's incident, as well as the June 4, 2002 safety violation and resulting two-day suspension, and argues that Plaintiff did not violate Entergy's Workplace Violence Policy.  *Id.* Plaintiff closes the letter by stating: "[T]his manager is telling people that is my last chance[.] [I] know what he's talking about an [*sic*] and I know what he's trying to do.  It's just trying to stop him [that]is the problem."  *Id.*

---

[14]   This complaint apparently was assigned to Mr. Bermingham for handling.  *See* Bermingham Dec., Def. Exh. J.

According to Melanie Nye, Mr. Packer's secretary, Plaintiff's letter was routed to Rod West, with a copy to Michael Bermingham, because Mr. Packer was not in the office when it was received. *See* Nye Dep., Pltf. Exh. M., at 21-23, 29-30. Regarding the matter, Mr. Packer states: "To the best of my knowledge and memory, Eric Jones never complained to me that he was being treated unfairly or being discriminated against based on his race." *See* Packer Dec., Def. Exh. L.[15] Plaintiff contends that he never received a response to the Packer letter.

After his suspension ended on May 22, 2003, Plaintiff took paid sick leave and then paid short term disability leave. *See* Bazile Dec., Def. Exh. A. He returned to full-time duty on or about July 2, 2003. *Id.* Mr. Bazile states that he, Mr. Janusa, and Danny Rivolo (Plaintiff's new Operations Coordinator for construction duty) met with Plaintiff at that time regarding their expectations of him and his commitment to the company. *Id.* According to Mr. Bazile, they told Plaintiff that, while they could not disregard the discipline that had taken place, they needed to put it behind them and move on.

---

[15] Plaintiff relies on a statement set forth in a letter written by Entergy counsel Anne Breaux to the EEOC, in response to Plaintiff's charge of discrimination, to argue that Ms. Conley and Mr. Packer knew about his complaints of discrimination. *See* Revised Opp. at 14; December 17, 2003 Letter to EEOC, Pltf. Exh. 7. Ms. Breaux's letter states, in pertinent part: "It was during these meetings [with Ms. Conley and Mr. Packer] that Mr. Jones raised race discrimination as a basis for his complaint" regarding his suspension resulting from the McDonald's incident. *Id.* Ms. Breaux has since explained that this statement is erroneous and resulted from her misunderstanding of information provided to her by Mr. Bermingham about his investigation of Plaintiff's ethics hotline complaint. *See* Anne Breaux Declaration, Def. Exh. AA. Ms. Breaux maintains that, as the time she drafted the EEOC response, she did not realize that Plaintiff, not Ms. Conley or Mr. Packer, had told Mr. Bermingham that Plaintiff had complained to them about "discrimination." *Id.* Ms. Breaux further states that, to the best of her recollection, Mr. Bermingham used the word "discrimination," rather than "race discrimination." *Id.* Resolution of these factual disputes is not necessary, however, as Defendant has assumed, for purposes of this motion, that Plaintiff can establish a prima facie case of retaliation.

34

The events of July 3- 4, 2003, and Mr. Bazile's investigation of those events followed. On or about July 15, 2003, as previously stated, Mr. Bazile removed Plaintiff from any service duty, and assigned him to full-time construction crew duty, until further notice, as a result of that investigation.[16] *See* Bazile Dec., Def. Exh. A. Thereafter, management decided to terminate Plaintiff as of August 21, 2003.

### h.    The Court's Determination Regarding Previous Incidents Involving Plaintiff

Having considered the summary judgment evidence regarding other incidents preceding Plaintiff's ultimate termination in August 2003, the Court does not find it sufficient to create a genuine issue of material fact with respect to Defendant's motivation for Plaintiff's termination. The Court acknowledges that factual disputes and some uncertainty exist regarding Defendant's follow-up to the letter Plaintiff directed to Mr. Packer's attention, and Plaintiff's conversations with Ms. Conley and Mr. Bermingham. Nevertheless, the Court, does not find that any of these disputes are sufficient to preclude summary judgment.

As stated herein, the Court finds no triable basis that would support a conclusion that Plaintiff was the subject of race discrimination on any of the occasions leading up to the events of July 4, 2003, and his termination in August 2003. With regard to retaliation, the Court

---

[16]    Plaintiff also has alleged that Ron Bushnell, Jr., a white male, replaced him on his service truck when he was moved from service duty to the construction crew. *See* Rev. Opp. at 19. Responding, Mr. Bazile states: "As Mr. Bushnell was a line mechanic II, it should be noted that [he] did not 'replace' Eric Jones, a senior line mechanic, on the service truck. He simply drove it during this rotation in the service department to obtain some of the experience necessary to become a senior line mechanic. " *See* Bazile Supp. Dec., Def. Exh. S. Regarding this issue, the Court simply notes that it, like Defendant, has assumed, for purposes of this motion, that Plaintiff can establish a prima facie claim of race discrimination and/or retaliation.

acknowledges that Plaintiff freely expressed his dissatisfaction of management's, and particularly Mr. Bazile's, handling of matters involving him during the approximately three years that he worked under Mr. Bazile, and that Plaintiff's complaints about Mr. Bazile were directed to upper management, including the Presidents and CEO's of Entergy, Louisiana, Inc., and Entergy New Orleans, Inc., in the months preceding his forty-hour suspension in May 2003, and/or his termination in August 2003. As previously stated, however, close proximity in time between assumed protected activity and materially adverse employer actions is not alone sufficient to create a genuine issue of material fact with respect to a plaintiff's ultimate burden in establishing a retaliatory motivation for the adverse action.

As the Court has explained, each progressive disciplinary action taken by Defendant toward Plaintiff, even if not overly lenient, is well supported in fact, is supported by contemporaneous documentation, and is within the realm of reasonable business judgment. Further, as the Court has noted, Mr. Bazile's evaluations of Plaintiff as of October 2002, and February 2003, do not suggest that Mr. Bazile was on a personal and legally impermissible mission to achieve Plaintiff's termination. In addition, each imposition of discipline, including the ultimate decision to terminate Plaintiff, resulted from consultation amongst various management and human resource personnel. These decisions were not those of Mr. Bazile alone. Under these circumstances, the Court does find, based on earlier incidents involving Plaintiff, that a triable question has been presented regarding Defendant's motivation for terminating Plaintiff.

3.       **Incidents Involving Other Employees**

Plaintiff finally urges that other instances for which no employee has been disciplined demonstrate Defendant's improper motive in terminating, or otherwise disciplining him. The Court disagrees, finding that these instances have not been demonstrated to be sufficiently similar to the events at issue here. Accordingly, they likewise do not create a genuine issue of material fact regarding Defendant's, and particularly Mr. Bazile's, treatment of Plaintiff.

a.       **Bayou Segnette Park - July 9, 2003**

Plaintiff points to an incident occurring in Bayou Segnette Park as one for which Mr. Bazile did not discipline the responsible lineman, who Plaintiff contends was Larry Matrana. *See* Rev. Opp. at 11. Mr. Matrana denies this claim. In any event, Mr. Bazile states that he had not heard of this incident prior to the depositions taken in this case. *See* Bazile Supp. Dec., Exh. S. In fact, Plaintiff testified in his deposition that he did not know if anyone actually told Mr. Bazile about this incident. *See* Plaintiff's Dep, Def. Exh. C, at 107-109. Plaintiff also testified that the line in question was not energized. *Id.* at 111. Given these facts, the Court finds that this incident has not been demonstrated to be sufficiently comparable to the 513 Dunbar Street events to create an inference of impropriety regarding Defendant's termination of Plaintiff.

b.       **592 Oakwood and 87/89 Derbes - July and November 2003**

Plaintiff also refers the Court to service at 592 Oakwood Drive and 87/89 Derbes Drive in July and November 2003 as examples of dangerous situations for which no one was disciplined. A leaning pole and wires on a roof for approximately six days apparently were involved at 592 Oakwood. *See* Rev. Opp. at 24. 87/89 Derbes Drive seemingly involved a low, energized

wire with which a meter service installer did not remain until the arrival of a service person. *Id.* Based on the evidence provide by Plaintiff, however, it is unclear, at a minimum, to the Court that the responsible party in these instances was a senior line mechanic, like Plaintiff, that the responsible party was white and/or had not engaged in protected activity, and had a disciplinary history comparable to Plaintiff's. Nor has Plaintiff demonstrated a triable issue with respect to Mr. Bazile's knowledge of this incident.

### c.    Roger Welch's Automobile Accident

Plaintiff also seeks to compare a 2001 automobile accident involving a white co-employee, Roger Welch, for which Mr. Welch was not disciplined with the two-day suspension Plaintiff received for failing to wear necessary rubber gloves in June 2002. The Court agrees that this incident is not a valid comparison to any of Plaintiff's infractions for which discipline was imposed at the behest of Mr. Bazile. With respect to Mr. Welch's auto accident, Mr. Bazile's supplemental declaration establishes that, after investigating the incident with the assistance and recommendation of Safety Department personnel, he determined that customer distraction contributed to the accident and thus did not impose discipline. *See* Bazile Supp. Dec., Def. Exh. S. He further establishes that he has, on other occasions, disciplined white employees for the involvement in avoidable car accidents. *Id.*

## II.    Hostile Work Environment

To prevail on a hostile work environment claim, a plaintiff must prove that: (1) he belongs to a protected group; (2) he was subjected to unwelcome harassment; (3) the harassment complained of was based on race; and (4) the harassment affected a term, condition, or privilege of

employment. *Frank v. Xerox Corp.*, 347 F.3d 130, 138 (5th Cir. 2003); *Celestine v. Petroleos de Venezuella, S.A.*, 266 F.3d 343, 353-54 (5th Cir. 2001). The plaintiffs must subjectively perceive the harassment as sufficiently severe or pervasive, and this subjective perception must be objectively reasonable. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 114 S. Ct. 367 (1993); *Frank*, 347 F.3d at 138. The fact-finder must consider the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *Frank*, 347 F.3d at 138; *Walker v. Thompson*, 214 F.3d, 615, 625 (2000).

According to Defendant, Plaintiff claims that Mr. Bazile made a racial slur on one occasion when he allegedly told Plaintiff: "I don't need your kind around here." Plaintiff also asserts that Mr. Janusa made a racial comment when he allegedly began to tell a joke about a "black guy and white guy working together . . . ." Mr. Janusa, however, did not use the "n" word. Defendant contends that Plaintiff has not claimed that any other member of management made other racial comments, jokes, or slurs, and thus cannot establish the "severe and pervasive" harassment necessary for actionable claim.

Plaintiff has offered no response to Defendant's motion insofar as it addresses Plaintiff's hostile work environment claim. Thus, given that no opposition has been offered with respect to this portion of Defendant's motion for summary judgment, the motion likewise is granted as to Plaintiff's hostile work environment claim.

## Conclusion

The Court finds that no genuine issue of material fact exists with respect to Defendant's motivation for terminating Plaintiff's employment. No opposition has been offered to Defendant's motion with respect to Plaintiff's hostile work environment claim. Accordingly, for the

reasons stated herein, **IT IS ORDERED** that Defendant's motion for summary judgment is

**GRANTED**, and Plaintiff's claims are dismissed with prejudice.

New Orleans, Louisiana, this 25th day of July 2006.

_____
**KURT D. ENGELHARDT**
**UNITED STATES DISTRICT JUDGE**